CARMEN *v.* ELI LILLY & COMPANY

[No. 16,444.   Filed March 25, 1941.]

*Joseph B. Meranze* and *Maurice A. Granatoor,* both of Philadelphia, Pennsylvania, *M. O. Sullivan,* of Shelbyville, and *Thomas E. Garvin* and *Floyd W. Burns,* both of Indianapolis, for appellants.

*George L. Denny* and *Walton M. Wheeler, Jr.,* both of Indianapolis, *Telford B. Orbison,* of New Albany, and *Herbert M. Jones,* of Shelbyville, for appellee.

CURTIS, ·C. J.—This is an action in damages for the wrongful death of appellants' decedent, John Carmen, brought by the appellants as plaintiffs against the appellee as defendant. Helen L. Carmen sued in a dual capacity i.e., individually as the widow of the decedent as authorized by the law of Pennsylvania, and as administratrix of the estate of the said decedent. The reason as stated by the appellants for suing in both capacities was to make sure that the action was properly brought regardless of which state law governed.

With some omissions, as indicated, of immaterial matter, we quote from the appellants' brief as follows: "By the appellants' amended complaint . . . it was

alleged in substance that Helen L. Carmen is a resident of Pennsylvania and is the widow of the decedent, John L. Carmen, and as such is authorized, under the Pennsylvania statute to maintain this action for wrongful death and also is the administratrix of the estate of said decedent. That the appellee manufactured and sold a biological, medicinal or pharmaceutical preparation known as 'Rabies Vaccine Lilly' which was intended for the prevention of the disease known as 'Rabies.' That the appellee, in writing, represented its said Rabies Vaccine to the medical profession, to the public in general, to the deceased and his physicians . . . as follows: 'This treatment is harmless, and valuable time is saved, in case the examination or investigation shows that the patient is in need of treatment.' . . . 'Remlinger, in a study of 107,712 cases, found 40 cases of paralysis, two resulting fatally' . . . 'It is well for the physicians to have these facts in mind although the dangers are very remote and do not effect the value or necessity of treatment.' . . . 'It is safe, from the standpoint of infection, and superior from the standpoint of the protection obtained.' . . .

"That the appellee otherwise through its advertisements and literature accompanying packages of said vaccine, expressly and in writing represented that the vaccine was perfectly safe and could be used without harmful consequences. That the decedent, John L. Carmen, on or about March 8, 1936, while in Philadelphia, Pennsylvania, placed his hand in the mouth of a rabid dog and thereafter was visited by Dr. Morris Fiterman, a medical inspector in and for the city and county of Philadelphia, Pennsylvania. That said Doctor Fiterman in reliance upon the very express representation of the appellee, recommended to the deceased the use of appellee's anti-rabies vaccine as a prophylatic

and immunizing agent to assure against the possibility of the deceased contracting rabies.

"That said Doctor Fiterman, with the consent of the deceased and in his behalf, ordered and prescribed that a set of said 'Rabies Vaccine Lilly,' purchased from the appellee by the Department of Health of the city of Philadelphia, be used in treating the said deceased for the aforesaid purpose. That accompanying the package of the appellee's anti-rabies vaccine was a pamphlet of description and directions for the use thereof issued by the appellee and inclusive of the afore-mentioned express representation. That said physician exhibited to said decedent . . . the literature accompanying the said vaccine and in reliance upon the same and the express representations of the appellee therein contained, the said John L. Carmen agreed to and did submit himself to the aforesaid treatment. That said 'Rabies Vaccine Lilly' was highly dangerous to human life and health, particularly to the life of the said decedent in that when used upon some persons and particularly upon the decedent, very serious and painful physical reactions ensued. That the appellee knew or was bound to know of the dangers connected with the use of said vaccine and that the deceased and said physicians would rely upon said representations.

"That after the said vaccine was administered to the person of said John L. Carmen and as a direct result of the use of the same and as the direct and proximate effect of the appellee's negligence in failing adequately to warn the deceased and his physician of the dangers involved in its use, the deceased became very seriously sick and suffered an ascending myelitis of the spinal cord, atelectasis lower lobes of both lungs, quadraplegia and finally death.

"That the deceased and said physicians were without notice or knowledge of the danger inherent in the use of said vaccine and they and each of them relied upon the knowledge, good faith, care and representations of the appellee as the manufacturer of said vaccine.

"That the liability of the appellee consisted in marketing, selling and recommending the use of its said antirabies vaccine with the misleading representations and misrepresentations contained in its pamphlet accompanying said vaccine and without sufficiently warning prospective users of its dangers, all of which were relied upon by the deceased and that said misrepresentations were negligently and fraudulently made by the appellee and relied upon by the deceased. The complaint alleged further that as a result of the appellee's said negligence the plaintiff was damaged in the sum of $50,000.00, and prayed judgment in that amount.

"To said amended complaint, the appellee filed its answer in general denial. On the issues so joined the cause was submitted before the court and jury for trial.

"At the conclusion of plaintiff's evidence in chief, the defendant, appellee herein, filed a written motion requesting the court to instruct the jury . . ., to find for the defendant, Eli Lilly and Company, which motion was granted by the court with exceptions to each plaintiff, and the court then, over the objection of each plaintiff, instructed the jury to return a verdict for the defendant. . . . The jury then in pursuance of the court's peremptory instruction . . . returned a verdict for the defendant."

The judgment followed the verdict. The appellants seasonably filed a motion for a new trial which was overruled and this appeal followed, the error assigned

being the ruling on said motion. The causes or grounds of said motion are:

"(1)    The verdict of jury is not sustained by sufficient evidence.

(2)    The verdict of the jury is contrary to law.

(3)    The court erred in sustaining defendant's motion for a directed verdict in favor of defendant.

(4)    The court erred in directing a verdict for defendant."

At the outset, it is to be remembered that this action is not based upon any charge that the appellee's vaccine product was improperly prepared or manufactured. The only charge in the amended complaint is that of negligent or fraudulent use of language describing the characteristics and effects of the vaccine in the pamphlet which accompanies the product. This pamphlet is referred to in this litigation as the plaintiffs' (appellants') exhibit 5. It should be mentioned now that the evidence wholly fails to show any active fraudulent conduct on the part of the appellee. The gist of the amended complaint is in the alleged negligent act of the appellee in marketing, selling and recommending its antirabies vaccine treatment with misleading representations and misrepresentations contained in its said pamphlet accompanying the vaccine and in insufficiently warning prospective users of its dangers. The said quoted part of the appellants' brief sets out correctly in a general way the manner in which the decedent became exposed to rabies.

The evidence shows that Doctor Fiterman, who was the medical inspector for the Department of Health of Philadelphia called upon the decedent after the dog had been found to be rabid and told him that antirabic treatment was imperative and that he ought to have it; that he thought the treatment was harmless, but also showed the decedent the pamphlet and told him,

"Once in a great while—it is rare—it is possible to get paralysis, but so far as our treatment—so far as all of the cases we have had, we never had had anything happen that I know of"; that the decedent had the pamphlet in his hands and turned the pages like the doctor did—probably more rapidly. In addition to the statements heretofore set out in this opinion as found in the appellants' brief, the pamphlet (appellants' exhibit 5) contained the following specific warnings of the risk involved in the use of the vaccine:

### "REMOTE ILL EFFECTS OF TREATMENT

"Occasionally, in addition to the local reactions observed during treatment, there have been disturbances ascribed to the treatment, such as 'treatment paralysis' coming on during the treatment or immediately afterward, and in a very few cases a fatal paralysis has occurred. Remlinger in the study of 107,712 cases, found forty cases of paralysis, two resulting fatally.

"It is not easy to explain the paralysis, and a number of causes have been suggested. It is rarely met with in children; it is relatively more common in syphilitics, alcoholics, persons under severe nervous strain, and brain workers. It is to be remembered, too, that a person who has been bitten by a rabid dog is likely to have nervous and hysterical symptoms.

"It is well for the physicians to have these facts in mind although the dangers are very remote and do not affect the value or necessity of treatment."

"There are no contraindications. Treatment is stopped if the patient develops rabies or paralysis. Other diseases, such as pregnancy, are not contraindications. The tendency to 'treatment paralysis' in syphilitics is not a contraindication to antirabie vaccination, but indicates antisyphilitic treatment."

### "ADVANTAGES OF RABIES VACCINE, LILLY

"The method used by Eli Lilly and Company in the production of Rabies Vaccine, Lilly, gives the physician a very satisfactory treatment for the

prevention of rabies. (1) It is safe, from the standpoint of injection, and superior, from the standpoint of the protection obtained. An effective resistance is established by a short course of treatment which is applicable to all types of cases. If an antirabic treatment is needed at all, the treatment administered should be adequate for all types of exposed cases. It cannot be stated definitely how little or how much rabies virus implanted in the tissues or coming in contact with them may result in the development of the disease. (2) The vaccine is standardized, making possible precision of dosage. (3) It has reduced the mortality rate very materially. (4) The risk of complications is decidedly less."

The decedent is presumed to have acquainted himself with not only a part, but all of the pamphlet. The evidence conclusively shows that Dr. Fiterman ■ knew all of the dangers and risks of the use of the vaccine and that he told the decedent about them. With this information and with the information given in the pamphlet about which oral and written evidence there is no dispute whatever, the decedent decided to take the treatment. We have also noted that the evidence discloses that the hospital record shows that the decedent was a regular daily drinker of whiskey and that upon occasions he would take many drinks in a day. The pamphlet which he read specifically pointed out that paralysis "is relatively more common in syphilitics, alcoholics, persons under severe nervous strain, and brain workers."

Doctor McCabe, a department chief of a large hospital in Philadelphia and who was the Carmen family physician testified in substance that he thought the death of the decedent was caused by an ascending myelitis caused by the vaccine that was administered and not to any defect in such vaccine and that the result (paralyses and death) happens occasionally, but

is quite rare and that the risk is remote; that such result is due either to the susceptibility of the patient or affinity to whatever is in the vaccine.

It is common knowledge, which the decedent, a man of mature age is presumed to have had, that for the past centuries rabies (hydrophobia) has been one of the most dreaded diseases of man, resulting usually in horrible suffering and death. The disease remained unconquered until Pasteur in 1885 gave the world the antirabic vaccine formula. The appellee's said vaccine treatment is based upon the Pasteur formula.

We think that the evidence conclusively shows that the decedent was fully informed and was in no way misled as to the possible effects of the vaccine. The said printed pamphlet in not less than four different places mentioned paralysis as a possible result. Doctor Fiterman, with his full knowledge of the possible result of the vaccine, testified that he considered the treatment harmless. This was the only expert medical testimony directly upon that point. In view of the places in the pamphlet where paralysis is mentioned and of at least two places in the pamphlet where the possibility of death from paralysis is set forth, it must be held that the word "harmless" as used in the pamphlet could only reasonably be construed as a relative and not an absolute term and that any reasonable adult lay person reading the pamphlet would be reasonably informed of all of the dangers incident to the use of the vaccine.

The decedent, with his knowledge of the horrors of hydrophobia on the one hand and the relatively small danger shown by the pamphlet to be possible from the use of the vaccine as well as the doctor's advice that the treatment was imperative and not dangerous, decided to take the treatment.

He is bound to consider the pamphlet as a whole and not single out and rely upon a single word or line or paragraph to the exclusion of the rest. He ▮▮▮ was also fully advised by Dr. Fiterman. We conclude that the evidence conclusively shows that both he and his physician were fairly and adequately warned by the appellee and·he must be held to have assumed the relatively small risk involved in the use of the vaccine treatment. The controlling fact is that paralysis resulting from the use of antirabic vaccine occurs only rarely and that the appellee gave fair and adequate warning of that fact in its pamphlet which the deceased read. The fact that the scientists do not agree upon any exact percentage of paralysis cases resulting from the treatment is unimportant where it is shown that they all agree that it is rare. The duty of the appellee was adequately to warn of the dangers incurred in the use of its said vaccine.

The parties do not disagree as to the rule of law applicable in directing a verdict. It has been ▮ well stated in *Davis* v. *Mercer Lumber Company* (1905), 164 Ind. 413, 73 N. E. 899, from which we quote as follows:

"It is a settled rule in this State that the right of the court to direct a verdict, as it did in this case, can only be upheld where, after a consideration of all of the evidence most favorable to the plaintiff, together with all the reasonable and legitimate inferences which a jury might have drawn therefrom, it can be said that the evidence is clearly insufficient to establish one or more facts essential to the plaintiff's right of action."

The recent decisions of this court have adopted and followed the rule announced in the above case.

The stipulation of the parties was to the effect that this kind of vaccine with its accompanying pamphlet was sold generally to drug stores in Philadelphia where

the treatment and death occurred and that the decedent could have purchased it from any of said drug stores without a prescription. The undisputed evidence in the case, however, is that he did not purchase the vaccine but that it was purchased and furnished for his use by the Philadelphia Department of Health. But if the evidence had shown that he himself purchased it, it would not have changed our conclusion, for the reasons heretofore stated. We think that the pamphlet met all the legal requirements as to notice and warning. Having reached this conclusion, it becomes unnecessary to consider the proposition asserted by the appellee that such pamphlet should be construed to be for the information of doctors only and not for the information of laymen.

The appellant contends and the appellee admits that it has certain duties under the law to inform users of the vaccine of the dangers to be encountered in its use, but appellee says that sufficient and adequate warning was contained in said pamphlet to discharge its obligations in that respect. We agree with this position of the appellee. Based upon the evidence which is wholly undisputed, we hold that any reasonably prudent adult person would be fully informed from it as to the results that might flow from the use of the vaccine so that he could thereby decide whether or not he would submit himself to the treatment and thus assume the risk.

Other theories of defense have been presented by the appellee as reasons for sustaining the decision of the trial court, but in view of the conclusions we have reached and announced, we do not deem it necessary to consider them further.

Judgment affirmed.

NOTE.—Reported in 32 N. E. (2d) 729.